UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HANNIBAL DWAN EASON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-2553 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| J.B. PRITZKER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Hannibal Eason is a partially deaf prisoner incarcerated by the Illinois Department of Corrections. He claims that the Governor and a group of Illinois prison administrators violated his statutory and constitutional rights by failing to accommodate his disability. He lacks hearing aids, sign language interpreters, teletypewriters, video phones, and other aids that he needs to navigate prison life.

Defendants moved to dismiss the complaint in part. They basically argue that the complaint is overbroad. It includes individual capacity claims against supervisory defendants who played no role in the alleged violations. Also, the complaint seeks injunctive relief against officials at the Stateville facility, even though Eason is no longer there. Finally, the complaint requests an injunction against the Governor, even though the Governor has no apparent connection to the policies in question.

For the reasons that follow, the Court grants in part and denies in part the motion to dismiss.

**Background**

Plaintiff Hannibal Eason is a hearing-impaired inmate in the custody of the Illinois Department of Corrections. *See* Fourth Am. Cplt., at ¶ 1 (Dckt. No. 82). He is currently incarcerated at Menard Correctional Center, but previously served time at Stateville Correctional Center. *Id.* at ¶ 8. Eason contracted meningitis as a child, leaving him partially deaf in both ears. *Id.* at ¶ 14. He is able to hear using hearing aids. *Id.* He communicates best, however, by using American Sign Language ("ASL"). *Id.*

Eason alleges that his partial deafness has made prison much harder on him, and he blames the prison system for failing to adequately accommodate his disability. His basic complaint is that the prisons have not provided adequate hearing aids, ASL interpreters, or other "auxiliary aids and services." *Id.* at ¶¶ 8–9, 14, 58, 61, 66–69, 75. He also says that the prisons did not give him sufficient access to a teletypewriter or video phone so he could communicate with the outside world. *Id.* at ¶ 9.

The complaint paints in broad brush strokes, without depicting any specific instances when he struggled without access to the aids. But the picture that emerges is that Eason couldn't communicate with others, and they couldn't communicate with him. *Id.* at ¶¶ 3–10. He hasn't been able to stay in touch with loved ones. *Id.* at ¶ 5. He can't talk with counselors or effectively discuss medical care with doctors. *Id.* He can't participate in religious services. *Id.* He can't take advantage of educational opportunities like academic classes or vocational training. *Id.* And so on.

"Plaintiff has been forced to serve his time largely isolated from [and] unable to effectively communicate with other human beings." *Id.* And without consistent access to adequate hearing aids or an ASL interpreter, Eason has been forced to rely on other inmates to navigate prison life, putting him in constant threat of exploitation. *Id.* at ¶ 7.

The communication gap has gotten him into trouble, too. "Plaintiff has been disciplined for not following orders which he could not hear." *Id.* at ¶ 6. The prisons did not use "visual notification systems" or other techniques to communicate with Eason so he could comply with guard demands. *Id.* at ¶ 51.

And once he was in trouble, the prisons did not enable Eason to defend himself against disciplinary charges. He "could not effectively communicate with hearing officers and investigators in his own defense." *Id.* at ¶ 6. He was left in handcuffs during disciplinary hearings, preventing him from using sign language or even pen and paper to communicate in his defense. *Id.* at ¶ 48.

The same communication breakdown has frustrated his attempts to use the prison grievance process to resolve problems. *Id.* at ¶ 8. The prisons conducted grievance hearings without "needed auxiliary aids and services," so he couldn't effectively communicate his complaints. *Id.*

Instead of granting his requests for accommodation for his hearing disability, Eason says that prison officials at Stateville simply transferred him out of the prison – first to Pontiac Correctional Center and then to Menard. *Id.* Eason says that this was a hardship transfer, sending him to a "higher security prison, with less of an ability to provide Plaintiff ADA accommodations." *Id.* at ¶ 34. But he doesn't elaborate on how things are different – or worse – at Menard.

Eason's allegations focus on his time at Stateville – before his transfer to Pontiac and then to Menard. *Id.* at ¶ 1 ("At all times relevant hereto Plaintiff was incarcerated at Stateville Correction Center in Joliet, Illinois."). But he claims that the same problems continue at Menard. *Id.* at ¶ 60. And he alleges that they are not isolated incidents. He alleges that IDOC

3

prisons suffer a systemic problem of failing to accommodate hearing-impaired inmates, a problem caused by "policies, regular practices, and/or customs of Defendants" that are "ongoing, and continue to this date." *Id.*

Eason advanced six claims in the fourth amended complaint. The first two are statutory claims, and the other four are constitutional claims.

In Counts I & II, Eason claimed that the Americans with Disabilities Act and the Rehabilitation Act required Defendants to accommodate his disability. *Id.* at ¶¶ 56–72. In Counts III to VI, Eason brought claims under section 1983, alleging that Defendants violated his constitutional right to free speech (Count III), his right to be free from cruel and unusual punishment (Count IV), and his rights to equal protection and due process (Counts V–VI). *Id.* at ¶¶ 73–97.

Eason sued high-ranking officials within Illinois state government. Defendants include current Illinois Governor J.B. Pritzker, current IDOC Director Rob Jeffreys, and former IDOC Director John Baldwin. *Id.* at ¶¶ 15–17. He also named IDOC ADA Coordinator Alan Pasley. *Id.* at ¶ 18. Finally, he named two executives at Stateville: Warden Walter Nicholson and Stateville ADA Facility Coordinator Donald Mills, Jr. (the "Stateville Defendants"). *Id.* at ¶¶ 19–20. There is another defendant (Dr. Page), but he or she did not move to dismiss, so this opinion will refer to the moving defendants as "Defendants."

## Analysis

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

4

To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Defendants did not challenge the sufficiency of the claims head-on. Instead, Defendants attempt to trim the case by reducing the number of defendants and narrowing the requested relief. The question at this point is the number of defendants and the scope of the remedies, not the adequacy of the claims themselves.

Eason advanced some claims against Defendants in their individual capacities, and some claims against Defendants in their official capacities. The lay of the land is as follows.

Eason brought statutory claims under the ADA and the Rehabilitation Act against only two Defendants: Governor Pritzker and current IDOC Director Jeffreys.[1] He sued them in their official capacities only. *See* Fourth Am. Cplt., at ¶ 15 (Dckt. No. 82) ("Governor Pritzker is sued in his official capacity."); *id.* at ¶ 16 ("Jeffreys is sued in his official capacity."). There are no claims under the ADA and the Rehabilitation Act against any Defendant in an individual capacity.

The constitutional claims are a bit more complicated. Eason advanced constitutional claims against Governor Pritzker and Director Jeffreys in their official capacities (only). Eason sued Director Baldwin in his individual capacity (only). *Id.* at ¶ 17 ("Mr. Baldwin is sued in his

---

[1] The fourth amended complaint also named former IDOC Director Baldwin as a defendant to Eason's ADA/Rehabilitation Act claims, *see* Fourth Am. Cplt., at ¶¶ 65–72 (Dckt. No. 82), but Eason dropped those claims in his response to the motion to dismiss because he is no longer the Acting IDOC Director. *See* Pl.'s Resp., at 8 (Dckt. No. 101). The Court therefore dismisses Eason's ADA and Rehabilitation Act claims against Defendant Baldwin.

individual capacity."). For the remaining Defendants, Eason brought constitutional claims against them in both their individual and their official capacities. *Id.* at ¶¶ 18–21.

Defendants advance a few basic arguments. First, they challenge the individual capacity claims under section 1983 on the grounds that they were not personally involved in the alleged violations. Second, they argue that Eason cannot obtain injunctive relief against the Stateville Defendants because he is no longer there. Third, they argue that Governor Pritzker is an improper party because he had no involvement in running the prisons. Finally, they challenge the belated request for monetary relief on the statutory claims – which appeared for the first time in Eason's response brief – because it does not appear in the complaint itself.

**I.  Individual Capacity Claims**

The four constitutional claims (Count III to VI) included claims against several of the Defendants in their individual capacities. Specifically, Eason alleged individual capacity claims against (1) former IDOC Director John Baldwin, (2) IDOC ADA Coordinator Alan Pasley, (3) Stateville Warden Walter Nicholson, and (4) Stateville ADA Facility Coordinator Donald Mills, Jr. *Id.* at ¶¶ 17–20. Eason did not bring any individual capacity claims in the first two counts, meaning the statutory claims under the ADA and the Rehabilitation Act.

Defendants basically argue that they had nothing to do with the alleged constitutional deprivations. *See* Mtn. to Dismiss, at 4–8 (Dckt. No. 92). The lack of any alleged involvement, in their view, means that there is no claim.

Officials face no individual liability under section 1983 unless they were personally involved in depriving a plaintiff of his or her constitutional rights. *See Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019) (citations omitted); *Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015) ("For constitutional violations under § 1983 or *Bivens*, a government official 'is only liable for his or her own misconduct.'") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009));

6

*Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996). To recover damages against an official in a supervisory role, a plaintiff "may not rely on a theory of respondeat superior and must instead allege that the defendant, through his or her own conduct, has violated the Constitution." *See Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015) (citation omitted); *see also Burks v. Raemisch*, 555 F.3d 592, 593 (7th Cir. 2009) ("The assumption underlying this choice of defendants – that anyone who knew or should have known of his eye condition, and everyone higher up the bureaucratic chain, must be liable – is a bad one.").

Sitting atop the chain of command is not enough to draw an official within the scope of liability. But a managerial or policy post isn't a firewall against liability, either.

For one thing, an administrator may find out about a constitutional violation so grave that it demands a response. "[A] prison official's knowledge of prison conditions learned from an inmate's communications can, under some circumstances, constitute sufficient knowledge of the conditions" to give rise to a duty to act. *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). But the communication must give the official "sufficient notice to alert him or her" to a risk to inmate health or safety. *Id.*; *see also Perez*, 792 F.3d at 782 (requiring "sufficient knowledge" by the prison official). The official must "realize[]" that a substantial risk of harm to the prisoner exists, "but disregard[] it." *Perez*, 792 F.3d at 781. "Once an official is alerted of such a risk," the refusal to act might give rise to a claim. *See Arnett v. Webster*, 658 F.3d 742, 756 (7th Cir. 2011).

But only a substantial risk of harm is enough to put an administrator on notice. Senior officials cannot "realistically be expected to be personally involved in resolving a situation pertaining to a particular inmate unless it were of the gravest nature." *See Antonelli*, 81 F.3d at 1428–29; *see also Harrell v. Sheahan*, 937 F. Supp. 754, 758 (N.D. Ill. 1996) ("The plaintiff has

7

not directed us to any evidence indicating that Sheriff Sheahan was personally involved in, or had knowledge of, [alleged violations]. Indeed, we would be surprised to find such evidence, given the role the defendant plays in the administration of the CCDOC."); *Perkins v. Williams*, 2018 WL 453743, at *4 (N.D. Ill. 2018) (explaining that high-level officials "cannot be expected, even with the inference allowed by *Antonelli*" to know about conditions affecting a specific cell or shower).

An administrator is, however, presumably knowledgeable about the jail's governing policies and how they affect inmates in general. An administrator "can be expected to know of or participate in creating systemic, as opposed to localized, situations." *See Antonelli*, 81 F.3d at 1429; *see also Smith v. Dart*, 803 F.3d 304, 310 (7th Cir. 2015) ("[T]he personal involvement of senior jail officials, such as [Sheriff] Dart, can be inferred at the motion to dismiss stage, where, as here, the plaintiff alleges 'potentially systemic,' as opposed to 'clearly localized,' constitutional violations.") (quoting *Antonelli*, 81 F.3d at 1428–29); *Sanders v. Sheahan*, 198 F.3d 626, 629 (7th Cir. 1999) (holding that "defendants such as the Sheriff and the Director of the Jail can realistically be expected to know about or participate in creating systemic jail conditions"). A high-ranking officer "can be expected to have personal responsibility" for "systemic violations." *Antonelli*, 81 F.3d at 1429.

A systemic violation means a general prison condition that affects a widespread group of inmates. *See Byron v. Dart*, 825 F. Supp. 2d 958, 963–64 (N.D. Ill. 2011). Examples include restrictions on library access, tampering with the mail system, inadequate recreation or nutrition, vermin infestations, and extreme hot or cold temperatures, among others. *See Antonelli*, 81 F.3d at 1426–27, 1429 (noting that claims such as "opened, delayed, and lost mail," "lack of recreation," vermin-infested living units, and "inadequate food" "allege systemic violations for

which the Sheriff and the Director can be expected to have personal responsibility"); *see also Gray v. Hardy*, 826 F.3d 1000, 1008–09 (7th Cir. 2016) (vermin infestation); *Smith*, 803 F.3d at 311 ("(1) inadequate food, (2) the presence of rodents and insects, (3) no mirrors, (4) lack of outdoor recreation, and (5) contaminated water"); *Foust v. Indiana*, 1999 WL 132199, at *2 (7th Cir. 1999) ("prison-wide policies restricting library access"); *Sanders v. Sheahan*, 198 F.3d 626, 629 (7th Cir. 1999) ("nutritionally deficient food and inadequate hygiene").[2]

A few courts in this Circuit have recognized that a failure to make reasonable accommodations for obvious physical disabilities also qualifies as a systemic problem, even if it affects only a few disabled prisoners. *See Norfleet v. IDOC*, 2018 WL 1640458, at *4 (S.D. Ill. 2018) (addressing a wheelchair-bound inmate in an overcrowded disability-equipped cell, thereby blocking his access to the toilet); *Despenza v. Sheriff of Cook County*, 2014 WL 1246298, at *2 (N.D. Ill. 2014) (considering a wheelchair-bound detainee in a cell without disability accommodations). For example, in *Crockwell*, Judge Dow noted that the Sheriff was

---

[2] *See also Turner v. Cook County Sheriff's Office by & through Dart*, 2020 WL 1166186, at *4–5 (N.D. Ill. 2020) (ineffective or non-existent policies to combat inmate drug overdoses); *Dodson v. Cook County Jail*, 2019 WL 764041, at *4 (N.D. Ill. 2019) (mold, dust, mildew, and contaminated drinking water); *Perkins v. Williams*, 2018 WL 453743, at *4 (N.D. Ill. 2018) (inadequate access to personal hygiene products and cleaning supplies); *Brown v. Bryant*, 2018 WL 2201584, at *3–4 (N.D. Ill. 2018) (inadequate policies to prevent and punish uses of excessive force); *Roman v. Hileman*, 2018 WL 3045622, at *5 (S.D. Ill. 2018) (unsanitary conditions); *Morton v. Dart*, 2017 WL 4785925, at *2–3 (N.D. Ill. 2017) ("extreme temperatures, mold in cells and communal showers"); *Brown v. Dart*, 2017 WL 3219217, at *2–4 (N.D. Ill. 2017) (inadequate shelter, sanitation, clothing, and food); *Lyons v. Vergara*, 2016 WL 4493455, at *4–5, *7 (N.D. Ill. 2016) (unsanitary conditions, absence of cleaning products, and vermin); *Crockwell v. Dart*, 2013 WL 6796788, at *3–4 (N.D. Ill. 2013) (inadequate handicapped facilities for wheelchair-bound detainees); *Potts v. Manos*, 2013 WL 5968930, at *4–5 (N.D. Ill. 2013) (alleged policies of excessive force and inadequate investigation); *Warren ex rel. Warren v. Dart*, 2010 WL 4883923, at *5–6 (N.D. Ill. 2010) (inadequate prison medical system); *Lieberman v. Budz*, 2010 WL 369614, at *7–8 (N.D. Ill. 2010) (inadequate shelter, vermin infestation, and contaminated water in condemned unit); *Barbosa v. McCann*, 2009 WL 2913488, at *1–2, *7 (N.D. Ill. 2009) (unsanitary conditions and inadequate cleaning supplies, vermin infestation, inadequate food, inadequate medical attention, and inadequate library access); *Jones v. Sheahan*, 2001 WL 1230551, at *5–6 (N.D. Ill. 2001) ("inadequate ventilation, excessive noise, inadequate heat, insufficient lighting, and tainted food and water" as well as "denial of reading materials").

"responsible for overseeing the general conditions of confinement at the jail," and thus was expected to have been "aware of or to have participated in creating the deleterious conditions" that affected wheelchair-bound inmates. *See Crockwell v. Dart*, 2013 WL 6796788, at *3 (N.D. Ill. 2013); *see also Armstrong v. Squadrito*, 152 F.3d 564, 581 (7th Cir. 1998) (explaining that "if the supervisor personally devised a deliberately indifferent policy that caused a constitutional injury, then individual liability might flow from that act").

The IDOC Director and ADA compliance officer are presumed to know about systemic problems with accommodations for prisoners with hearing disabilities. *See Antonelli*, 81 F.3d at 1429. The same is true for the Stateville Warden and ADA compliance officer for hearing-impaired prisoners at that facility. *Id.*

The complaint contains allegations about challenges facing hearing-impaired inmates generally, meaning problems that seem systemic. For example, several paragraphs address challenges that hearing-impaired inmates face at disciplinary hearings. *See* Fourth Am. Cplt. ¶¶ 45–47 (Dckt. No. 82). Other paragraphs describe communication obstacles that deaf inmates frequently encounter, such as an inability to hear prison alarms and instructions from guards. *Id.* at ¶¶ 50–51. Many of the allegations do seem to describe problems specific to Eason. *See, e.g., id.* at ¶¶ 5–10. But at least some of the allegations describe problems that affect hearing-impaired inmates generally.

Defendants hold high-level positions with authority over policies that apply to hearing-impaired inmates. Baldwin and Pasley were in charge of all IDOC prisons across Illinois, with Pasley in charge of ADA compliance. Nicholson was the Stateville Warden, and Mills was in charge of ADA compliance at Stateville. They may not have day-to-day interactions with hearing-impaired prisoners like Eason. But they likely have more power than boots-on-the-

10

ground corrections officers, prison education staff, or doctors to do what Eason wants most – make accommodations for his hearing disabilities. They are presumed to know about the alleged failures to accommodate ahearing-impaired inmates. *See Antonelli*, 81 F.3d at 1429.

In addition to imputed knowledge, Eason has alleged – albeit in conclusory fashion – that he "submitted numerous written complaints to Defendants requesting that accommodations be made available to him" and that "Defendants have actual knowledge of the unconstitutional conditions to which Plaintiff has been and continues to be subject . . . ." *See* Fourth Am. Cplt., at ¶ 83 (Dckt. No. 82). At this early stage, that allegation is enough to put the administrators on notice of the alleged constitutional violations, particularly given that Eason complained of "systemic" not "localized" problems. *See Antonelli*, 81 F.3d at 1429; *see also Perez*, 792 F.3d at 782 (noting that an official who is not "directly responsible for the constitutional deprivation" may nevertheless be held personally responsible where the prisoner sent "many letters" to the official, who "systematically ignored these requests for redress") (citing *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). The specific details are lacking, but he alleges enough to give notice of his claim.

Maybe the facts will look different at the summary judgment stage. But for now, Eason has alleged enough to give notice of his individual capacity claims under section 1983 to Defendants Baldwin, Pasley, Nicholson, and Mills (Counts III–VI). The motion to dismiss those claims is denied.

## II.   Official Capacity Claims

Defendants make targeted arguments against the official capacity claims. They argue that Eason can't obtain injunctive relief against the Stateville Defendants because he isn't at Stateville. They also argue that Governor Pritzker is not a proper party when it comes to the request for injunctive relief. They challenge monetary damages, too. The Court agrees.

11

### A. Injunctive Relief Against Stateville Defendants

The Stateville Defendants argue that any official capacity claims against them for injunctive relief are moot because Eason is not there. Eason is incarcerated at Menard, not Stateville. The idea is simple – officials at one prison can't change what happened at another.

Defendants are correct. "If a prisoner seeking injunctive relief for conditions of confinement at a particular prison is transferred without a realistic possibility of return, then his request for relief becomes moot." *Tolentino v. Baker*, 679 F. App'x. 503, 504 (7th Cir. 2017); *see also Maddox v. Love*, 655 F.3d 709, 716 (7th Cir. 2011).

Eason is no longer at Stateville. After transfer, he is now at Menard. *See* Fourth Am. Cplt., at ¶¶ 8, 14 (Dckt. No. 82). He alleges no facts showing a realistic possibility of being transferred back to Stateville. *See Tolentino*, 679 F. App'x. at 504. Therefore, the claims for injunctive relief against the Stateville Defendants (Counts III–VI) are dismissed as moot. *See Maddox*, 655 F.3d at 716.

### B. Injunctive Relief Against Governor Pritzker

Defendants also challenge the request for injunctive relief against Governor Pritzker. The gist of the argument is that the Governor is not a proper party for prospective injunctive relief because he does not have any alleged connection to the violations in question. And without a connection, the Eleventh Amendment stands in the way of prospective injunctive relief against a state official.

The Supreme Court "has consistently held that an unconsenting state is immune from suits brought in federal courts by her own citizens" under the Eleventh Amendment. *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974). "Sovereign immunity is the privilege of the sovereign not to be sued without its consent. . . . [A]bsent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State." *Virginia Office for Prot. & Advocacy v.*

*Stewart*, 563 U.S. 247, 253–54 (2011). "[T]he principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Article III . . . ." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984).

The immunity extends to state officials. "State agencies and officials sued in their official capacities are 'the state' for Eleventh Amendment purposes." *Olison v. Ryan*, 2000 WL 1263597, at *4 (N.D. Ill. 2000). But there are three exceptions. The first is consent – a state may waive immunity and agree to suit in federal court. *See Indiana Prot. and Advocacy Servs. v. Indiana Family and Social Servs. Admin.*, 603 F.3d 365, 371 (7th Cir. 2010). The second is the abrogation of the state's immunity by Congress. *Id.* And the third is a demand for prospective injunctive relief under *Ex parte Young*. *Id.*

In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court addressed a request for an injunction to stop a state official from prospectively violating the Constitution. The Supreme Court held that the claim was not barred by the Eleventh Amendment on the theory that the official's actions were beyond the state's powers. *Id.* at 160. That is, when there is unconstitutional conduct, it is not the state itself doing the act – it is the official acting without any authority. *See Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) ("[The *Ex parte Young* exception] rests on the premise – less delicately called a 'fiction,' – that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes.") (citation omitted); *see also McDonough Assoc., Inc. v. Grunloh*, 722 F.3d 1043, 1050 (7th Cir. 2013) ("*Ex parte Young* employed a chameleon-like legal fiction . . . .").

That theory applies if the defendant is the official who is doing the unconstitutional thing – *e.g.*, enforcing an unconstitutional policy. So there needs to be a connection between the

13

defendant and the conduct to obtain prospective injunctive relief against a state official. "In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Ex parte Young*, 209 U.S. at 157.

Courts require a link between the "official's duties and powers under state law" and the alleged unconstitutional act to ensure that the official is not merely a representative of the state. *See Deida v. City of Milwaukee*, 192 F. Supp. 2d 899, 914 (E.D. Wis. 2002). For example, if a plaintiff objects to enforcement of an unconstitutional statute, he can sue the official charged with enforcing that statute. *See Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 644–45 (7th Cir. 2006) (holding that an attorney general with power to enforce statute meets the standard). And the official need not have *exclusive* enforcement powers. Any official with enforcement power – even if shared with others – satisfies the "some connection" standard. *See id.* at 644–45. But not just any state official will do. "[F]or a case to fall within the scope of *Ex Parte Young,* the official being sued must be the party whose prospective actions would violate the federal law invoked." *Crosby v. Blagojevich*, 2008 WL 5111172, at *2 (N.D. Ill. Dec. 4, 2008); *see also Hearne v. Bd. of Educ. of City of Chicago*, 185 F.3d 770, 777 (7th Cir. 1999) (holding that a governor not charged with enforcement did not meet the standard); *Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*, 980 F.2d 437, 440–41 (7th Cir. 1992) (holding that an attorney general did not have the required connection because the statute lacked enforcement penalties, and because the attorney general never threatened enforcement).

Governors do not automatically satisfy the "some connection" standard simply by sitting atop the executive branch. As the Supreme Court explained in *Ex parte Young*, the exception would swallow the rule if governors were fair game simply because of their position:

> If, because [the governor and attorney general] were law officers of the state, a case could be made for the purpose of testing the constitutionality of the statute, by an injunction suit brought against them, then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former, as the executive of the state, was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the state in litigation involving the enforcement of its statutes.

*Ex parte Young*, 209 U.S. at 157; *see also Illinois League of Advocates for the Developmentally Disabled v. Quinn*, 2013 WL 5548929, at *3–4 (N.D. Ill. 2013) ("A theory of liability predicated on a governor's general obligations as the executive of the State cannot avoid the consequences of the Eleventh Amendment.") (collecting cases); *Mexicana v. Indiana*, 2013 WL 4088690, at *6 (N.D. Ind. 2013); *Marie O. v. Edgar*, 1994 WL 262193, at *4–5 (N.D. Ill. 1994) ("A Governor's generalized duty under Article 5, § 8 of the Illinois Constitution to 'faithfully execute' Illinois law, is insufficient to satisfy the requirement that a state official bear some connection with the enforcement of a challenged statute."); *see also Hearne*, 185 F.3d at 777 ("[T]he governor has no role to play in the enforcement of the challenged statutes, nor does the governor have the power to nullify legislation once it has entered into force.").

To fall within *Ex parte Young*, and thus obtain prospective injunctive relief against a governor, a plaintiff must allege specific involvement by the governor in the unconstitutional policy or practice. *See H.O.P.E., Inc. v. Eden Mgmt. LLC*, 2017 WL 4339824, at *8–9 (N.D. Ill. 2017) (holding that the governor had "some connection" to enforcement of a program where the "governor's office issued notices" concerning a state program); *Love v. Pence*, 47 F. Supp. 3d 805, 808–09 (S.D. Ind. 2014) (holding that the governor had "some connection" to enforcing a

15

state law where the governor "issu[ed] *instructions* to state agencies" on compliance) (emphasis in original); *Bowling v. Pence*, 39 F. Supp. 3d 1025, 1029 (S.D. Ind. 2014) (holding that the governor had "some connection" to enforcement of a state statute concerning the recognition of marriages by same-sex couples where he sent memoranda on the issue).

Eason's complaint does not meet that standard. The complaint does not allege any meaningful connection between Governor Pritzker and the prison policies for disabled inmates. The complaint alleges that Illinois prisons have "policies, regular practices, and/or customs" that fail to accommodate his hearing disability. *See* Fourth Am. Cplt., at ¶ 60 (Dckt. No. 82). But that's about it. The complaint does not include a single sentence alleging that Governor Pritzker did anything, let alone play a role in crafting or enforcing disability policies for prisons.

Only a single paragraph of the complaint mentions the Governor at all. The complaint alleges that Governor Pritzker has "oversight responsibility" over all of the state agencies and employees. *Id.* at ¶ 15. That is true, but it's not enough. If anything, that allegation is telling, and reveals what Eason is trying to achieve – an injunction against the Governor because he's the Governor. Eason seeks prospective injunctive relief against the Governor simply because he is the top official in the executive branch in state government. Under *Ex parte Young*, that's a non-starter.

The lack of a connection between the Governor and the alleged violations would foreclose the claim, even if the Eleventh Amendment did not stand in the way. A complaint must tie the defendant to the conduct, but Eason has failed to latch the two together. *See Hearne*, 185 F.3d at 777 ("Technically, therefore, it is not the Eleventh Amendment that bars the plaintiffs' action for prospective injunctive relief against the governor; it is their inability to show that he bears any legal responsibility for the flaws they perceive in the system.").

16

The claims for prospective injunctive relief against Governor Pritzker (Counts I & II) are dismissed.

### C. Monetary Relief

Defendants also make a targeted challenge to the request for monetary relief on the official capacity claims.

Eason concedes that he is not seeking damages for any official capacity claims under section 1983. *See* Pl.'s Resp., at 10 (Dckt. No. 101). The concession was unavoidable. Section 1983 does not allow suits for damages against state officials in their official capacities.

A suit against a state official in his or her official capacity is a suit against the state, and a state is not a "person" who may be liable for damages under the section 1983 statute. *See* 42 U.S.C. § 1983; *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64, 71 (1989); *Phillips v. Illinois Dep't of Fin. and Prof'l Regulation*, 718 F. App'x. 433, 434–35 (7th Cir. 2018); *Kolton v. Frerichs*, 869 F.3d 532, 535–36 (7th Cir. 2017). So, based on the text of the statute, Eason cannot recover damages on the official capacity claim under section 1983, even aside from constitutional considerations raised by the Eleventh Amendment. *See Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974) ("[A]n unconsenting State is immune from suits brought in federal courts by her own citizens."); *see also Arizonans for Official English v. Arizona,* 520 U.S. 43, 69 n.24 (1997) ("State officers in their official capacities, like States themselves, are not amenable to suit for damages under Section 1983.").

But Eason contends that he may seek monetary damages for his statutory claims under the ADA and the Rehabilitation Act against Governor Pritzker and IDOC Director Jeffreys. Eason argues that those statutes do not bar the recovery of damages on official capacity claims (unlike section 1983), and Illinois does not enjoy sovereign immunity from suits for damages under the ADA and the Rehabilitation Act. *See* Pl.'s Resp., at 8–9 (Dckt. No. 101); *see also*

17

*United States v. Georgia*, 546 U.S. 151, 159 (2006) (holding that the ADA abrogated state sovereign immunity for ADA claims that also violate the Fourteenth Amendment, but declining to answer whether the ADA abrogated immunity for claims that do not also violate the constitution); *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 n.5 (7th Cir. 2012) ("Illinois has waived its immunity from suits for damages under the Rehabilitation Act as a condition of its receipt of federal funds.").

There is a more basic problem. Eason didn't demand damages on the statutory claims in his fourth amended complaint. Instead, he demanded injunctive relief only. *See* Fourth Am. Cplt., at ¶¶ 64, 72 (Dckt. No. 82) ("As a result of Defendants [sic] past and continuing conduct Plaintiff has been harmed and seeks injunctive relief that alleviates and rectifies the aforementioned violations to prevent similar deprivation from continuing in the future."). Rule 8(a)(3) provides that a complaint "must contain" a "demand for the relief sought." *See* Fed. R. Civ. P. 8(a)(3). Eason cannot obtain a remedy that he did not request.

## Conclusion

Defendants' motion to dismiss is granted in part and denied in part. The motion to dismiss the individual capacity claims is denied. The motion to dismiss the claims for injunctive relief against Nicholson and Mills (*i.e.*, the Stateville Defendants) is granted. The motion to dismiss the claims for injunctive relief against Governor Pritzker is granted. The motion to dismiss the official capacity claims for monetary relief is granted. Count I and II are dismissed against Defendant Baldwin, the former Acting IDOC Director.

Date:  November 18, 2020

Steven C. Seeger
United States District Judge

19